## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CRIMINAL ACTION NO. 5:17-cr-00026-TBR

UNITED STATES OF AMERICA                                      PLAINTIFF

v.

JEVAN SHEPPARD                                              DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant Jevan Sheppard's ("Sheppard") Motion to Suppress. [DN 87.] A suppression hearing was held November 19, 2019. The government has responded. [DN 112.] Sheppard has replied. [DN 115.] As such, this matter is ripe for adjudication. For the reasons that follow, **IT IS HEREBY ORDERED** that Sheppard's Motion to Suppress [DN 87] is **DENIED.**

### I.  Background

On June 13, 2017, Sheppard was charged in an indictment with (1) conspiracy to distribute/possess with intent to distribute a controlled substance, the use of which resulted in death and serious bodily injury, (2) distribution of a controlled substance, the use of which resulted in death and serious bodily injury, (3) possession with intent to distribute a controlled substance, and (4) importing a controlled substance into the United States, the use of which resulted in death and serious bodily injury. [DN 1.] More specifically, Sheppard is charged with the possession/distribution of U-47700—a controlled substance—and causing the death and/or serious injury of T.M. and K.M. [*Id.*]

Late Match 21, 2017, law enforcement executed a search warrant at Sheppard's residence in Calvert City, Kentucky. [Supp. Hrg. R. (Riddle) 13: ¶ 25; 14: ¶¶ 1-3.] Sheppard and his

girlfriend, Kayla Todd ("Todd") were in bed sleep when officers arrived to execute the warrant. [Supp. Hr. R. (Mighell) 39: ¶¶ 9-12.] After handcuffing both Sheppard and Todd, officers escorted them to the living room. [*Id.* at 45: ¶¶ 3-7.] Sheppard argues, and the government denies, Detective Jesse Riddle then told Sheppard, "if you cooperate, she won't go to jail." [Supp. Hrg. R. (Sheppard) 73: ¶¶ 19-20.] Sheppard was then taken to a separate room and interviewed by Detectives Riddle and Mighell. [Supp. Hrg. R. (Riddle) 7: ¶¶ 9-10.] After Sheppard was interviewed, the detectives interviewed Todd in the same room. [Supp. Hrg. R. (Todd) 57: ¶¶ 10-14.] Both were given their *Miranda* warnings prior to being interviewed. [Supp. Hrg. R. (Riddle) 7: ¶¶ 24-25; 8: ¶ 1.]

After conducting the interview with Todd, she was returned to the couch in the living room. [Supp. Hrg. R. (Todd) 59: ¶¶ 7-11.] Sheppard states he was then arrested and removed to a police car. Sheppard further states, and the government again denies, that Detective Riddle verbally berated Sheppard. [Supp. Hrg. R. (Sheppard) 77: ¶¶ 11-16.]

Sheppard was taken to the Marshall County Detention Center. He was again given his *Miranda* warnings and then made a statement. [Supp. Hrg. R. (Riddle) 9: ¶¶ 20-21.] Sheppard argues he only made both statements because of the threat to arrest Todd. The government denies making such threats but also argues even if the statements were made, the detectives had the right to arrest Todd.

## II. Discussion

### A. Sheppard's First Statement

"The Fifth Amendment prohibits the prosecution's use of a defendant's compelled testimony." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994) (citing *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985)). "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional

2

privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The Supreme Court explained custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444.

Here, there is no question Sheppard was in custody when giving his first statement. Sheppard was handcuffed while being interviewed. Further, Detective Riddle stated "[Sheppard] was not free to leave." [Supp. Hrg. R. (Riddle) 24: ¶ 17.] Therefore, this was a custodial interrogation.

"[T]he determination [as to] whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.*" Fare v. Michael C.*, 442 U.S. 707, 724 (1979) (citing *Miranda*, 384 U.S. at 475–77). The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his Miranda rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir.2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

The Government bears the burden of proving by a preponderance of the evidence that a confession was voluntary. *Id.* at 410. A confession was involuntary if all three elements are shown: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Johnson*, 351 F.3d 254,

260 (6th Cir.2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999)). "Coercion may involve psychological threats as well as physical threats. Specifically, threats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993). Where a threat to a suspect's family member has been made, the outcome "turns on the issue of whether the threat could have been lawfully executed." *Johnson*, 351 F.3d at 263 (6th Cir. 2003).

Sheppard cites to *Finch* to support his motion. In *Finch*, officers received a search warrant to search Finch's residence for cocaine. *Finch*, 998 F.2d at 351. Finch, his mother, and his girlfriend were all present when the warrant was executed. *Id.* When officers entered the house, all three denied there was any cocaine present. *Id.* at 355. The officers told Finch that if any cocaine was found, all three would be arrested unless someone admitted ownership. *Id.* Finch then showed the officers where the cocaine was located. *Id.* Finch stated, "he disclosed the location of the cocaine to the police so that his mother would not be arrested." *Id.* The Court found Finch's statement—the act of disclosing the location of the cocaine—was involuntary for several reasons.

> "[T]he police had no basis for concluding (1) that either woman had knowledge of the existence of cocaine in the house; (2) that either woman had knowledge that Finch was involved in the distribution of cocaine; (3) that a conspiracy existed; (4) that either woman was in constructive possession of the cocaine for which the police were searching; or (5) that either woman was an aider or abettor."

*Id.* at 356. Here, Detective Riddle denied making any threats to arrest Todd prior to the interviews taking place. [Supp. Hrg. R. (Riddle) 22: ¶¶ 8-16.] He does, however, admit that it was possible he told Todd she would serve eighty-five percent of the time if she went to prison. [*Id.* at 29: ¶¶ 23-25; 30: ¶ 1.] Detective Riddle also stated, "we did at some point, I believe, discuss the possibility that this case could go federal, and it did." [*Id.* at 28: ¶¶17-18.] When considering all the testimony, the Court finds it is more likely Detective Riddle did threaten to arrest Todd. Todd

4

and Sheppard both allege Detective Riddle's comments about the case going federal and serving eighty-five percent of time occurred after the first interviews were completed. It is more likely that Detective Riddle already had discussions about possibly arresting Todd prior to the above stated comments were made. Since this Court has found that Detective Riddle did threaten to arrest Todd, the Court must evaluate whether he in fact had the right to do so.

Prior to executing the search warrant at Sheppard's home, Detective Riddle conducted an interview with Thomas Hardin—Sheppard's co-defendant. [*Id.* at 5: ¶¶ 14-25; 6: ¶¶ 1-4.] In that interview, Hardin "implicated Mr. Sheppard as a source" for illegal drugs. [*Id.* at 5 ¶¶ 21-25; 6: ¶¶ 1-4.] Hardin provided information that Sheppard supplied drugs that allegedly led to the death of one individual and the overdose of another. [*Id.* at 6: ¶¶ 8-11.] Detective Riddle stated they did not have any evidence that Todd was involved in the selling or distribution of drugs prior to executing the search warrant. [*Id.* at 16: ¶¶ 24-25; 17: 1-17.] Therefore, the only issue is whether the drugs in plain view and Todd's presence in the room were enough to warrant an arrest.

The government relies on *Johnson* to support its position that probable cause to arrest Todd existed. In *Johnson,* police officers executed a warrant at the residence of Hennis Tracy, Johnson's half-sister. 351 F.3d at 257. Prior to obtaining the warrant, officers observed Johnson visiting Tracy's home and staying for several days at a time. *Id.* While Johnson was present, there were "numerous short-term visitors, parking up to six or eight cars at a time". *Id.* A confidential informant told police he witnessed cocaine being sold at the residence. *Id.* Johnson was not at Tracy's home when the warrant was executed that found more than nine grams of crack cocaine in Tracy's headboard. *Id.* Tracy disclaimed ownership of the drugs and when Johnson arrived, police told him they would not arrest Tracy if Johnson surrendered and claimed the drugs. *Id.* Johnson later confessed. *Id.*

5

Johnson argued his statement was not made voluntarily but was coerced due to the threat to arrest Tracy. *Id.* at 260. However, the Court found there was probable cause to arrest Tracy. *Id.* at 263. In contrast to *Finch,* Johnson was selling drugs out of Tracy's home. *Id.* The Court found Tracy must have at least had suspicions about Johnson's activities due to the frequent visits by customers and the presence of cocaine in the house. *Id.* Further, the drugs were found in Tracy's bed. *Id.* The Court found these facts created sufficient probable cause to arrest Tracy.

"To establish constructive possession, the evidence must indicate 'ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.' Physical proximity to drugs, or mere presence in an area where drugs are found, is not sufficient." *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010) (quoting *United States v. White,* 932 F.2d 588, 589 (6th Cir. 1991)).

Here, Sheppard placed the U-4 in the garage and people would pick it up and leave money there. [*Id.* at 37: ¶¶ 2-5; *See* Government's Exhibit 1 at 19:00 to 19:25.] There is no indication that Sheppard sold drugs inside the home. Although this home was not Todd's legal residence, she stayed with Sheppard seventy percent of the time. [Government's Exhibit 1 at 45:30 to 46:00.] She also testified she was "under the assumption that somebody was breaking into our house" when officers arrived. [Supp. Hrg. R. (Todd) 53: ¶¶ 5-6.] This indicates Todd did have some dominion or control over the home. Unlike the women in *Finch,* Todd admitted she was aware Sheppard was ordering U-4 and was aware U-4 was present in the home. [*Id.* at 64: ¶¶ 5-11.] Although Todd denies that there were lines of U-4 out in plain view, in his first interview, Sheppard did not deny there was U-4 in plain view. [*Id.* at 64: ¶ 4; Government's Exhibit 1 at 3:35-3:45.] When all evidence is reviewed together, there was probable cause for the officers to arrest Todd. Todd was

6

not only in the presence of drugs; she had some control over the home and was aware of Sheppard ordering and using the U-4. Therefore, Sheppard's statement was voluntary.

**B.  Sheppard's Second Statement**

Sheppard argued his second statement was also coerced because the threat to arrest Todd remained. However, as the Court stated above, there was probable cause to arrest Todd. Therefore, Sheppard's statement was not coercive and voluntary. As such, the statement will not be suppressed.

### III.    Conclusion

For the above stated reasons, **IT IS HEREBY ORDERED** that Sheppard's Motion to Suppress [DN 87] is **DENIED**.

**IT IS SO ORDERED.**

**Thomas B. Russell, Senior Judge**
**United States District Court**

June 23, 2020

cc: counsel

7