UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO.: 5:17-CR-00026-TBR-1

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| V. | |
| JEVAN SHEPPARD | DEFENDANT |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Sheppard's Motions in Limine seeking the exclusion of expert testimony and documentary evidence concerning "the existence and/or quantity of U-47700 allegedly in the blood samples of T.M. and K.M., and any alleged causal connection between U-47700 in those blood samples and the death and/or injury of T.M. and K.M., pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1973)." [DN 93; DN 137; DN 173]. The Court held a Daubert Hearing on November 9, 2020. [DN 154; DN 156]. After the hearing, the United States filed a brief in response to Sheppard's motions. [DN 170]. Sheppard then filed a brief in support of his motions. [DN 173]. The motions are ripe. Sheppard's Motions in Limine, [DN 93] and [DN 137], are GRANTED IN PART AND DENIED IN PART.

   I.   **Background**

Sheppard is before the Court for allegedly distributing U-47700 ("U-4"), a designer synthetic opioid, to co-defendant, Jared Hardin, who in turn allegedly distributed it to T.M. and K.M. Then, T.M. and K.M. allegedly ingested the U-4. T.M. died and K.M. was seriously injured. Sheppard was indicted on June 13, 2017 of four separate charges for alleged importation, conspiracy to possess, possession, and distribution of the U-4 resulting in death or serious bodily injury. [DN 1]. Blood samples were drawn from both T.M. and K.M. and the samples were

eventually submitted to two different labs—Axis Labs and NMS Labs—for toxicological testing. Sheppard has moved the Court to exclude expert testimony and documentary evidence concerning the toxicological testing as to the U-4, alleging the evidence is not admissible under Federal Rule of Evidence 702 and *Daubert*.

## II. Standards

Federal Rule of Evidence 702 provides the standard for admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The trial court is the 'gatekeeper' of expert testimony, and thus it must exclude any opinion evidence that is unreliable and irrelevant, but it also has 'considerable leeway' in determining reliability." *Babcock Power, Inc. v. Kapsalis*, 2021 WL 1149690, at *5 (6th Cir. Mar. 25, 2021) (citing *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002)). "Four inquiries guide the reliability analysis: Is the technique testable? Has it been subjected to peer review? What is the error rate and are there standards for lowering it? Is the technique generally accepted in the relevant scientific community?" *United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) (citing *Daubert*, 509 U.S. at 593-94). While these inquiries provide guidance, the "core inquiry" and "what matters most" in determining admissibility is whether the evidence is the product of reliable principles and methods and whether those principles and methods have been reliably applied to the case. *Id.* Moreover, the four *Daubert* inquiries do not

apply in every case, and trial courts enjoy considerable discretion in determining their applicability. *Mem'l Hall Museum, Inc., v. Cunningham*, 455 F.Supp.3d 347, 366 (W.D. Ky. 2020) (citing *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001)). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

### III. Discussion

In its motions in limine, the defense asks the Court to exclude evidence that the government intends to introduce through three expert witnesses. As explained in its brief, the government intends to call Kevin Shanks and Dr. Laura Labay to testify regarding the toxicological testing of blood and/or urine samples taken from T.M. and K.M. [DN 170 at 3-4]. Shanks is a forensic toxicologist at Axis Forensic Toxicology, the first lab that conducted testing on the specimens. [DN 160 at 4; Government Exhibit 13, CV of Kevin Shanks]. Dr. Labay is a forensic toxicologist and director of toxicological services at NMS Labs, the second lab that conducted testing on the specimens. [DN 160 at 52; Government Exhibit 15, CV of Dr. Laura Labay]. The government also intends to call Dr. George Behonick to testify regarding the interpretation of the results of the toxicological testing. *Id.* Dr. Behonick is director and chief toxicologist at Axis Forensic Toxicology. [DN 160 at 89; Government Exhibit 14, CV of Dr. George Behonick]. The defense requests that the Court exclude the testimony of these witnesses, in addition to "any documentary evidence concerning the existence and/or quantity of U-47700 allegedly in the blood samples of T.M. and K.M., and any alleged causal connection between U-47700 in those blood samples and the death and/or injury of T.M. and K.M." [DN 173 at 1]. Neither the experts' qualifications nor the relevance of the expert testimony and corresponding documentary evidence are in dispute. The parties only dispute the reliability of the evidence under subsections (b), (c), and (d) of Rule 702.

### a. Axis Labs Evidence

The defense argues that Axis Labs's[1] test results are unreliable because its method of testing for U-4 has not been shown to be reliable. [DN 173 at 7-8]. Specifically, the defense argues that because Kevin Shanks himself developed the test that Axis uses to test for U-4, and because no third-party outside of Axis has tested the methodology or procedure used by Axis to determine if it is reliable, the United States has not shown that Shanks's testimony will be based on sound science. *Id.* at 7-9. The government argues that forensic testing of bodily fluids is not novel, and "a process is followed by individual labs to develop testing for novel substances." [DN 170 at 6]. As the government states:

> The process begins with the laboratory obtaining a certified reference standard, and these are eventually included with other standards to develop a test panel (in this case at Axis, the Novel Psychoactive Substances panel). The developed testing procedures undergo method validation, during which accuracy, precision, interference, and reliability are confirmed. This method of testing development is similar to that utilized by other labs, and the practices employed are consistent with industry standards. The process described by Shanks is quite similar to the process used by NMS labs, as described by Dr. Labay. Dr. Behonick testified that the methods used to test the samples in this case are consistent with the methods used by other labs to test for similar substances.

*Id.* The defense asked Shanks whether "anyone else other than Axis determined that [its] method . . . produces valid results." [DN 160 at 42]. Shanks testified that Axis uses "proficiency testing," where "an outside vendor will send a bunch of samples," and Axis must accurately quantify substances in the samples to be graded well. *Id.* The defense further asked Shanks whether there is "any peer-reviewed literature that has determined that the method utilized by Axis labs produce scientifically valid results." *Id.* at 43. Shanks testified that he had not seen any such confirmation in the literature, and he "wouldn't expect to see that in the literature" because "[e]ach individual lab develops their own way and their own process." *Id.* Further, on cross-examination of

---

[1] Axis was the first lab to conduct testing on the specimens.

government witness Dr. Behonick, the defense asked "[o]n what do you base the opinion that the methods used by Axis are similar . . . to the methods used by other labs?" *Id.* at 100. Dr. Behonick responded:

> The primary method of doing the U-4 analysis was by high-performance liquid chromatography-mass spectrometry. That's a mainstay in forensic toxicology. Now, there may be subtleties and differences in the way extractions are done and in the instruments that are used, but that is a mainstay method that is germane across the board in forensic toxicology.

*Id.* at 100-01. Further, when defense asked Dr. Behonick who validated Axis to test blood for U-4, Dr. Behonick responded that it was an "internal validation" conducted by Shanks, and that Axis validates its own methods "just as NMS validates their methods." *Id.*

Though it is not entirely clear, it appears that defense does not challenge the actual testing technology but whether Axis's methods in using the technology are reliable in testing U-4. The defense attacks Axis's testing methods primarily on the grounds that no third-party has verified the methods, or, as Shanks described it, taken Axis's "exact method and duplicated it and tested [it]." *Id.* at 43. The defense argues that the lack of peer-reviewed literature on Axis's testing methodology further shows that Axis's methods are unreliable. [DN 173 at 7-9].

Contrary to defense's arguments, the Court does not find that Axis's methods for testing U-4 are unreliable. Dr. Behonick testified that Axis's method of conducting the U-4 testing was "high performance liquid chromatography-mass spectrometry," which he further described as a "mainstay in forensic toxicology." [DN 160 at 100-01]. Again, the defense does not argue that "high performance liquid chromatography-mass spectrometry" is an unreliable testing technology, but that Axis's methods are unreliable. However, Shanks explained that Axis verifies its test results through proficiency testing to validate its testing methods, and Dr. Behonick testified that this is the way other labs, including NMS, validate their methods as well. *Id.* at 42; 100-01. The defense

5

expert also testified that he "accept[s] the NMS results" and he "think[s] they do a good job." *Id.* at 120. In short, the Court is assured that Axis's testing methods are reliable because of its internal validation procedures. While peer review is a factor that may be considered in determining the reliability of a given testing method, it is not a requirement. Based on these considerations, the Court finds that the government has shown that Axis's method of testing U-4 in blood is reliable sufficient to satisfy Rule 702 by a preponderance of the evidence. Accordingly, the Court will not exclude Axis's test results for the U-4 or the corresponding expert testimony on the grounds that its methods for testing U-4 are unreliable.

Defense also contends that the U-4 test results from Axis Labs have not been shown to be produced from reliable principles and methods. [DN 173 at 4]. In support of this argument, the defense argues that because Axis Labs lost the underlying data and test results of the testing for U-4, Shanks's testimony that T.M.'s and K.M.'s blood samples tested positive for U-4 will not be based on sufficient facts or data, will not be the product of reliable principles and methods, and will not be the product of reliable application of reliable principles and methods. *Id.* at 4-7.

As Shanks explained during the *Daubert* hearing, Axis Labs "could not locate the calibration data, the quality control data, and the specimen data for the U-47700 testing." [DN 160 at 20]. Shanks further testified that although the lab could not locate the underlying data for the testing of the U-4 in T.M.'s and K.M.'s blood, "[t]he samples did get tested, and they were tested and reported." *Id.* at 21. Upon further questioning from the government, Shanks confirmed that calibration and quality control measures in accordance with the lab's standard operating procedures would have to have been performed for the results to be reported. *Id.* The defense asked Shanks how the data for the U-4 testing was lost, and Shanks replied that he could only speculate that it was a "filing error" or an "archival error." *Id.* at 25. The documents showing that that T.M.'s

and K.M.'s blood samples tested positive for U-4 are "batch chain of custody document[s]" that Shanks explained are archived in a separate system from the archival system used to archive the underlying testing data. *Id.* at 28-29. The batch chain of custody documents include handwritten notes that indicate positive results for U-4 in both K.M's blood sample and in T.M.'s blood sample. [Government Exhibit 4, Axis Litigation Packet—K.M., pp. 192-93, US-2357-58; Government Exhibit 5, Axis Litigation Packet—T.M., pp. 281-82, US-2648-49; DN 160 at 19-20].

In short, there is documentation indicating that Axis Labs's testing yielded positive results for U-4 in T.M.'s and K.M.'s blood, but the calibration data, quality control data, and specimen data for the testing was lost. The defense contends that the most important consequence of this data loss is that "there is no way to know if Shanks' 'has applied the principles and methods reliably to the facts of the case'" such that Shanks's testimony would comply with subsection (d) of Federal Rule of Evidence 702. [DN 173 at 7]. However, the defense also challenges the admissibility of Shanks's testimony and the corresponding evidence under subsections (b) and (c) of Rule 702 as well:

> In the instant case, the United States can produce no evidence establishing what it actually did to test the samples, whether it followed its own protocol, whether it calibrated the relevant instruments and equipment before use and cannot produce contemporaneous lab notes created recording the actual steps taken, or the actual raw data results. Instead, the U.S. can only produce a hand-written note purporting to record the results of a test for which the actual data has purportedly been lost. Sheppard submits that, under these circumstances, Shanks' purported testimony does not meet any of the factors required under Fed. R. Evid. 702.

*Id.* at 5-7.

The government argues that the loss of data does not invalidate Axis's test results. [DN 170 at 8]. Specifically, the government contends that the absent documentation does not render the testing unreliable because the data's unavailability does not mean that the standard procedures for calibration and quality control were not performed. *Id.* The government argues that "[t]he testing

7

was also subject to an internal peer-review process and would not have been reported if the standard procedure was not followed." [DN 170 at 8; DN 160 at 20-22]. On direct examination during the *Daubert* hearing, Shanks explained Axis's testing process as follows:

> Q. So, Mr. Shanks, walk us through the process that was used to test the samples from [T.M.] and [K.M.] for this U-47700.
>
> A. Yes. We utilize an organic extraction process just called a protein precipitation with acetonitrile. It is a -- you take a sample of blood, you add a certain amount of acetonitrile or water solution with certain materials in it, you mix it up, you centrifuge it down, you take some of that liquid off the top, put it into another tube, and then you evaporate that down to dryness and then reconstitute in another liquid mix, and then you take that liquid and put it into a vial. And then at that point, you're going to inject that into an instrument.
>
> With each batch of samples and specifically in any case, we also run calibrators, so known -- or drug -- blood that's spiked with known amounts of substance. And then we also run quality control samples, both positive and negative.
>
> We extract all of those together. We run them on the instrument, which is a liquid chromatography with triple-quadrupole mass spectrometry, or LC-MS/MS. The LC, or the liquid chromatography, is the portion that separates everything out. So you inject that sample into some liquid onto what we call an analytical column. That essentially separates the sample into parts, and then those are then introduced into a mass spectrometer, which essentially gives a readout of a chemical fingerprint of a substance if something is detected so we can determine if it is U-47700 or cocaine or heroin or something else. But specifically in this case, it was for those designer opioids and novel psychoactive substances.
>
> <u>After that instrument is done running the sample and the calibrators and quality control samples, that data will be reviewed, and then it will also be certified. And once all quality control criteria are met and if everything is valid in the calibrators and quality controls, everything is acceptable according to our data quality guidelines, we will sign off on the batch that it is acceptable, it is certified, and it is reported in our system or on our database that we use to report results.</u> And then the sample is completed, and all testing for that specific test is done.

[DN 160 at 17-18 (emphasis added)]. The government further asked Shanks about what must be done to publish or report the results:

> Q. And, again, the standard procedure for this novel psychoactive substances panel would require that you do all of those things, that calibration data, et cetera, et cetera. All of that would have to be performed in order for you to publish results?
>
> A. Correct, yes.

8

> Q. Okay. Is there an internal peer-review process for results when they're reported? Does someone go back and make sure that all the steps have been performed in order for results to be published?
>
> A. Yes, there is.
>
> Q. And is that fairly standard throughout the scientific community?
>
> A. Yes. Very, yes.

[DN 160 at 21-22].

The Court will exclude Axis's test results and the corresponding expert testimony as the evidence relates to testing of U-4. Because Axis lost the calibration data, the quality control data, and the specimen data for the U-4 testing, Shanks's testimony explaining what steps were required in order for the results to be reported is the only evidence the government has offered indicating that Axis's testing methods were reliably applied. Shanks explained that Axis's internal review process requires review and approval of the data that is now lost in order for results to be reported. In other words, Shanks's testimony is that the results would not have been reported in Axis's system or database, or ultimately, to the government, without assurance that the lab's principles and methods were reliably applied to its testing of T.M.'s and K.M.'s blood samples. Despite this explanation of Axis's standard procedures, and even accepting that such procedures are in place, Shanks's testimony does not demonstrate that the testing was conducted reliably by a preponderance of the evidence. Simply, Shanks's reliance on Axis's standard procedures is not enough to establish, by a preponderance of the evidence, that the U-4 testing was done properly. The results depend on the lost calibration data, quality control data, and specimen data. Shanks argues that Axis would not have published the results unless the data mentioned above were accurate. This is not enough in this case. Absent the data supporting the claimed results, the results are not reliable. *See Am. Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 138-39 (6th Cir. 1995)

(affirming trial court's exclusion of expert testimony where expert had discarded raw data underlying his testing and was unsure whether his testing equipment had been calibrated). The Court finds that the government has not met its burden to demonstrate that Axis's U-4-related test results are reliable. Accordingly, evidence of Axis's testing of the U-4 and the expert testimony pertaining thereto must be excluded. Because the Court determines that the evidence of Axis's U-4 testing is inadmissible under Rule 702, the Court need not address defense's arguments for excluding Axis's U-4 testing on grounds of hearsay or the best evidence rule. [*See* DN 93 at 7-9].

### b. NMS Labs Evidence

As the defense explains in its brief, after the government learned that Axis lost the underlying data for the U-4 testing, the government had T.M.'s and K.M.'s specimens tested by NMS Labs. [DN 173 at 2]. At the time NMS tested the specimens, they were nearly three years old. *Id.* The government intends to call Dr. Laura Labay, a forensic toxicologist at NMS Labs, to testify regarding the testing done by NMS. The defense argues that the NMS results and Dr. Labay's testimony should be excluded because NMS's testing methodology is unreliable in the same way that Axis's testing methodology is unreliable, because there is no evidence of how the specimens were stored during the time between testing at Axis and testing at NMS, and because the stability of U-4 in blood over time is unknown. *Id.* at 9-13.

Defense states, "[t]he Court should exclude Dr. Labay's testimony because NMS' methodology, like that of Axis, has also not been shown to be reliable and Sheppard adopts the previous argument concerning Axis' unverified methodology." *Id.* at 9. The Court has already determined that the government has shown Axis's testing methods for U-4 to be sufficiently reliable,[2] primarily based upon testimony explaining that Axis's methods undergo proficiency

---

[2] The Court is excluding the Axis U-4 evidence because of the lost data, not because Axis's testing methods are unreliable.

10

testing to ensure accuracy. The government had the following exchange with Dr. Labay during direct examination at the *Daubert* hearing:

> Q. And, Dr. Labay, do you, I guess, have any information or are you aware of the way that NMS developed its testing for U-47700?
>
> A. Yes.
>
> Q. All right. And generally describe that process for us.
>
> A. At NMS Labs, before a method is put into production, the sample -- or, I'm sorry, the method has to undergo development and validation. That is done in the research and development section of NMS Labs. That's the development part of the method. Then the analytical method undergoes validation, where the method is challenged. And the accuracy of the method, the precision of the method, the acceptability around the lower limit of quantification, the analytical measurement range, the stability of the analyzing, the different matrices, that's all evaluated. The analytical method has to meet predetermined acceptance criteria and then has to be accepted by the technical director of the department and the assistant laboratory director of the department before it's put into production.
>
> Q. And I assume that there are continuing quality control measures that take place in regards to instruments and testing processes during, before, and after various tests are performed?
>
> A. Yes.

[DN 160 at 59-60]. To the extent that the defense alleges that the NMS testing methodology is unreliable because it has not been simulated and verified by a third party, that argument fails. Dr. Labay explained that NMS internally validates its methods for accuracy, as Axis Labs does. As explained above, peer review is only a factor that may be considered in determining the reliability of a given testing method, and the Court has determined based on the testimony of the witnesses that internal validation is an appropriate guarantee of reliability for each lab's testing methods. To the extent that the defense intends to offer a different argument, it has failed to develop any such argument. Thus, the Court will not exclude the NMS data or Dr. Labay's testimony on the grounds that NMS's testing methods are unreliable.

11

The defense next argues that the NMS Labs test results should be excluded because there is no evidence of how T.M.'s and K.M.'s specimens/samples were stored during the time the samples were held by Axis Labs before they were transferred to NMS Labs. [DN 173 at 10]. As the defense contends, "Axis Labs has essentially no chain of custody documentation and cannot establish where T.M.'s and K.M.'s samples were during the close to three years they were allegedly at Axis." *Id.* Defense argues that Axis's reliance on its standard operating procedures is not enough to establish that the samples were properly stored such that their integrity was maintained during the three years they were in storage. *Id.* Defense states, "[i]n the instant case, Axis Labs has no evidence demonstrating that the samples at issue were refrigerated, and then frozen, for the nearly three (3) years the samples were in its custody, and without that foundation, the testing of NMS is wholly unreliable and should be excluded." *Id.* at 11. However, the defense also acknowledges that chain of custody issues "normally go to weight rather than admissibility." *Id.* at 10 (citing *United States v. Allen*, 619 F.3d 518 (6th Cir. 2010)).

During the *Daubert* hearing, the defense questioned the experts regarding storage and chain of custody of the samples. Shanks testified that Axis's standard operating procedures require samples to be held in refrigerated temperatures during active testing, and "at the point when all testing is completed, it is then transferred to long-term storage, which is frozen temperature." [DN 160 at 45]. Shanks also testified that Axis follows the Society of Forensic Toxicologists, American Academy of Forensic Sciences, and American Board of Toxicology guidelines, and while Axis keeps no log of "cases that are removed from the refrigerators or freezers," he had not seen any requirement for such logging in the guidelines and standards by which Axis abides. *Id.* at 39-40. The defense also asked Dr. Labay about NMS's chain of custody. The defense argues that "NMS' chain of custody documentation stands in sharp contrast to the absence of chain of custody

documentation maintained by Axis." [DN 173 at 10]. The defense cites the following exchange with Dr. Labay during the *Daubert* hearing:

> Q. And you document it for a specific sample. You don't just say, "Well, these are our standards and that's what's supposed to happen, so I assume that happened here"?
>
> A. Well, we have standards. We have standard operating procedures, but then we document it for each sample.
>
> Q. And that's the standard that's required under most certification programs?
>
> A. Yeah. For forensic testing, you have to have chain of custody documentation.
>
> Q. For each specific sample; correct?
>
> A. Well, we have -- so we have it for the sample itself, like what we received into the laboratory, and then NMS has chain of custody for the aliquots that were taken from the sample for testing. So the laboratory has to be able to say, you know, we received these samples on this date, we did these analytical tests with the sample on this particular day, and this is how we account for the use of that sample for the testing purpose -- for testing purposes.
>
> Q. And if you –
>
> A. There has to be something in place –
>
> Q. Yeah. And if you –
>
> A. -- for chain of custody.
>
> Q. Right. And if you don't have that, you can't testify to a reasonable degree of scientific certainty, can you?
>
> A. I -- for me, we have -- NMS Labs has chain of custody for our stuff.

[DN 160 at 84-85]. Contrary to defense's argument, Dr. Labay's testimony does not indicate a sharp contrast between chain of custody procedures at Axis and NMS. Defense primarily takes issue with Axis's lack of records showing where the samples were during the time the samples were in long-term storage. However, Dr. Labay's testimony only addresses NMS's standards for chain of custody of samples during active testing, not its standards for chain of custody of samples

in long-term storage. Thus, Dr. Labay's testimony does not demonstrate that Axis and NMS have different procedures for recording the location of samples in long-term storage. Dr. Labay's testimony does little, if anything, to support the defense's argument that Axis's records of the samples while in long-term storage are inadequate.

The government argues that Axis's specimen security and chain of custody procedures were confirmed as compliant with American Board of Forensic Toxicology Standards in July 2017. [DN 170 at 9]. Perhaps most importantly, during the government's redirect examination of Shanks, the government asked Shanks about notations in Government Exhibits 16 and 17 dated February 22, 2018 stating, "DO NOT DESTROY-IN LITIGATION AND PROCESSING . . . EXT STORAGE – FEDERAL CASE." [Government Exhibit 16, Axis Addendum T.M., p. 68; Government Exhibit 17, Axis Addendum K.M., p. 63]. The government engaged in the following exchange with Shanks regarding these notes:

> Q. Mr. Shanks, in Exhibit 17, the addendum in regards to [K.M.] -- I think it's the last page -- there's a notation on this document that indicates that as of 2/22 of 2018 there was a "do not destroy" order in place, and there's a notation that the sample was in extended storage. Do you see that?
>
> A. Yes, I do.
>
> Q. All right. Does that shed any light to you in interpreting this on where the sample is, or is this document sort of irrelevant to that question?
>
> A. The extended storage is our frozen storage. I mean, that's how we refer to it. But that is a comment that was added that does say extended storage. So, yes, I mean, I would expect that sample to be in extended storage at that point in time.
>
> Q. And, similarly, in Government Exhibit 16 -- I believe it's the last page as well -- there's an additional notation from 2/22 of '18 that the sample there in regards to [T.M.] was in extended storage?
>
> A. That's correct, yes.
>
> Q. So, again, your expectation based off that notation would be that it was in the freezer in extended storage, those samples; correct?

    A. Correct.

    Q. In fact, there's additional information on this page that details when the samples from [T.M.], at least a portion of them, were then sent to NMS Labs and what was received back from NMS Labs; correct?

    A. Correct, yes.

[DN 160 at 49-50].

    As the Sixth Circuit has stated, and as the defense concedes, "[c]hain of custody issues are jury questions and the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *Allen*, 619 F.3d at 525. "Merely raising the possibility of tampering or misidentification is insufficient to render evidence inadmissible." *United States v. Granderson*, 651 F. App'x 373, 380 (6th Cir. 2016) (quoting *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004)). "The possibility of misidentification or alteration must be 'eliminated, not absolutely, but as a matter of reasonable probability.'" *United States v. Mehmood*, 742 F. App'x 928, 938 (6th Cir. 2018) (quoting *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997)).

    Here, the Court does not find that the evidence from NMS should be excluded because of any issues with chain of custody. The defense has raised the possibility of misidentification or alternation of the samples because Axis does not keep specific logs of samples that are in long-term freezer storage. However, the pertinent notations in Government Exhibits 16 and 17, along with Shanks's testimony regarding the lab's standard procedures for storage, provide reasonable probability that the samples were not misidentified or altered during the time before the samples were sent to NMS. Accordingly, the chain of custody issues here go to weight, and not admissibility. The Court will not exclude the NMS evidence or Dr. Labay's testimony due to any issues with chain of custody.

Last, the defense argues that that the NMS evidence should be excluded because the stability of U-4 in a blood sample over time is not known. [DN 173 at 11]. As the defense contends, and as defense witness Dr. Long and Dr. Labay appeared to agree, it is unknown how stable U-4 is in a blood sample beyond one year. *Id.* at 11-13. In other words, testing a blood sample for U-4 after a year has passed may not provide an accurate result for the quantity of U-4 in the blood at the time the sample was taken. The government argues that what is unknown about how U-4 concentrations in blood change over time does not render NMS's testing unreliable. [DN 170 at 7]. The government states, "internal quality control sample stability assessment at NMS determined that U-47700 blood and serum concentrations remained stable over a one-year period of time." *Id.* Further, the government argues that NMS's test results are consistent with Axis's test results, in addition to other evidence the government intends to offer at trial. *Id.*

Here, the Court will grant the defense's motion to exclude in part. During cross-examination, Dr. Labay stated that although the three-year time period might have affected the concentration of U-4 in the blood samples, ultimately, she could still testify that "this drug was present, this is the concentration that was found three years after the fact, and offer an opinion about what this drug meant." [DN 160 at 69-70]. However, without any information about the stability of U-4 in blood samples beyond a year, the Court cannot conclude that NMS's findings as to the quantity of U-4 in the blood samples are reliable. Moreover, a conclusion about the quantity of U-4 in the blood samples at three years after the samples were taken cannot be said to be based on sufficient facts and data or reliable principles and methods. Although Dr. Labay testified that NMS found that U-4 remained stable in blood for up to a year, as far as she was aware, NMS had not assessed the drug's stability "beyond a 12-month period time." *Id.* at 66. In short, evidence about the quantity of U-4 in three-year-old blood samples is not sufficiently reliable

16

to be admissible under Rule 702. Accordingly, the Court will exclude evidence of NMS's results as to the *quantity* of U-4 in the blood samples. However, NMS's results and expert testimony pertaining thereto will be admissible as to the *presence or existence* of U-4 in the blood samples, and any alleged causal connection between the presence or existence of U-4 in those blood samples and the death and/or injury of T.M. and K.M.[3]

### IV.   Conclusion

For the reasons stated above, Sheppard's Motions in Limine, [DN 93] and [DN 137], are GRANTED IN PART AND DENIED IN PART. The Axis evidence as to the U-4 testing and corresponding testimony is excluded. The NMS evidence is admissible except that evidence as to quantity must be excluded. IT IS SO ORDERED.

cc: counsel

---

[3] The Court understands that government witness Dr. Behonick, and potentially other government witnesses, will be testifying that the presence or existence of U-4 in T.M.'s and K.M.'s blood is more important than the quantity of U-4 in T.M.'s and K.M.'s blood as such presence or existence relates to the causal connection between U-4 and the death of T.M. and the serious bodily injury of K.M.